IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARK SAPON,

    Plaintiff,

    v.

PAUL JACKSON, individually and
as a DEPUTY SHERIFF OF
FULTON COUNTY, GEORGIA,

    Defendant.

CIVIL CASE NO.
1:07-CV-3147-JTC

O R D E R

This matter is currently before the Court on Defendant's motion for summary judgment [# 43]. Plaintiff Mark Sapon brought this action against Deputy Paul Jackson pursuant to 28 U.S.C. § 1983 alleging that Deputy Jackson used excessive force in violation of the United States Constitution while arresting him at the Georgia Dome during a college football game. Defendant moves for summary judgment on the grounds that he is entitled to qualified immunity and that his actions were constitutional. For the reasons that follow, the Court **GRANTS** Defendant's motion for summary judgment [# 43].

I.    **Factual Background**

Where a party disputes a specific fact and points to evidence in the record supporting its version of events, the Court has viewed such evidence

and factual inferences in the light most favorable to the nonmoving party, as required when considering a motion for summary judgment. See United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc); see also LR 56.1B(2), NDGa. Most of the facts in this case, however, are not in dispute.

At the time of the incident giving rise to this dispute, Plaintiff was a first year dental student at West Virginia University. (Sapon Dep. 56:19-25, Jul. 14, 2008.) On January 2, 2006, Plaintiff and several of his friends were in Atlanta, Georgia for the 2006 Nokia Sugar Bowl, which was being held at the Georgia Dome. (Def.'s Statement of Material Facts ("Def.'s SMF") ¶ 1; Pl.'s Resp. to Def.'s SMF ("Pl.'s Resp.") ¶ 1.) The 2006 Nokia Sugar Bowl pitted the Georgia Bulldogs against the West Virginia Mountaineers.

Prior to the start of the Sugar Bowl, Plaintiff and his friends tailgated for a few hours. (Def.'s SMF ¶ 3; Pl.'s Resp. ¶ 3.) While tailgating, Plaintiff consumed five or six beers. (Def.'s SMF ¶ 4; Pl.'s Resp. ¶ 4.) After Plaintiff and his friends were done tailgating, they walked into the Georgia Dome to watch the game. (Def.'s SMF ¶ 5; Pl.'s Resp. ¶ 5.) Plaintiff's seats were in the upper level student section of the Georgia Dome. (Def.'s SMF ¶ 6; Pl.'s Resp. ¶ 6.)

During the fourth quarter of the game, an individual complained to the

Georgia Dome security officers about a group of fans in the student section causing a disturbance. (Def.'s SMF ¶ 7; Pl.'s Resp. ¶ 7.) The individual identified Plaintiff and his friends as the cause of the disturbance. (Def.'s SMF ¶ 7; Pl.'s Resp. ¶ 7.) Because the Georgia Dome security officers were unable to effectively handle the situation, they requested the presence of a police officer. (Def.'s SMF ¶ 8; Pl.'s Resp. ¶ 8.) Deputy Jackson responded to the request for assistance. (Def.'s SMF ¶ 8; Pl.'s Resp. ¶ 8.)

When Deputy Jackson arrived at the scene, the security officers where speaking to one of the individuals involved in the disturbance. (Def.'s SMF ¶ 11; Pl.'s Resp. ¶ 11.) After walking part of the way up the steps to the upper level, Deputy Jackson motioned for Plaintiff and his friends to come down the steps to the area where he was standing. (Def.'s SMF ¶¶ 11-12; Pl.'s Resp. ¶¶ 11-12.) Meanwhile, a supervisor for the security officers explained to Deputy Jackson the events that took place prior his arrival. (Def.'s SMF ¶ 12; Pl.'s Resp. ¶ 12.)

While exiting the stands, Plaintiff and his friends passed in front of Deputy Jackson. (Def.'s SMF ¶ 14; Pl.'s Resp. ¶ 14.) As Plaintiff waked in front of him, Deputy Jackson observed Plaintiff's glassy eyes and that his breath had a strong odor of alcohol. (Def.'s SMF ¶ 14; Pl.'s Resp. ¶ 14.) Deputy Jackson proceeded to escort Plaintiff and his friends out of the

Georgia Dome. (Def.'s SMF ¶ 14; Pl.'s Resp. ¶ 14.) Deputy Jackson was walking directly behind Plaintiff at the time. (Def.'s SMF ¶ 16; Pl.'s Resp. ¶ 16.) Plaintiff is approximately six-foot-one and weighed around 185 pounds. (Sapon Dep. 17:15-23.) Deputy Jackson ordered Plaintiff several times to "continue to walk." (Def.'s SMF ¶ 17; Pl.'s Resp. ¶ 17.)

As Deputy Jackson escorted Plaintiff and his friends through the concession area of the Georgia Dome, Plaintiff abruptly turned halfway to his right and asked why he and his friends were being escorted out of the game. (Def.'s SMF ¶ 18; Pl.'s Resp. ¶ 18; Sapon Dep. 29:4-31:16.) Although, Deputy Jackson testified that Plaintiff's arms were raised when he turned, causing Plaintiff's right hand to come near his face, Plaintiff testified that he did not raise his arms. (Def.'s SMF ¶ 18; Sapon Dep. 36:19-37:7.) Both parties acknowledge that Deputy Jackson responded to Plaintiff's sudden movement by touching Plaintiff in some way. Deputy Jackson contends that he pushed the back of Plaintiff's neck with the tip of his fingers on this left hand in order to prevent Plaintiff's right hand from making contact with his face. (Def.'s SMF ¶ 19.) In contrast, Plaintiff contends that Deputy Jackson struck Plaintiff on the back of his neck with a closed fist. (Sapon Dep. 32:1-10.).

In support of Plaintiff's version of events, a third party witness who was in the concession area at the time of the incident, testified that he saw a

uniformed police officer and other security officers walking behind a group of six or seven individuals. (Vaughan Aff. ¶ 3, Sept. 23, 2008.) As the group walked in front of him, the police officer struck the individual in the rear of the group with either his closed fist or the knuckles of his hand. (Id. ¶¶ 4-5.) According to this witness, the strike was unprovoked by the individual, who took two steps before falling to his knees. (Id. ¶¶ 6-7.)

Shortly thereafter, another Georgia Dome security officer arrived on the scene and inquired as to whether Plaintiff needed medical attention. (Def.'s SMF ¶ 24; Pl.'s Resp. ¶ 24.) Deputy Jackson then attempted to place Plaintiff under arrest for failing to comply with his orders to "continue to walk," but the security officer stated that Plaintiff needed medical attention and would not release Plaintiff to Deputy Jackson. (Def.'s SMF ¶¶ 20, 25; Pl.'s Resp. ¶¶ 20, 25.) After Deputy Jackson's supervisor arrived at the scene, Deputy Jackson placed Plaintiff under arrest for obstruction of a law enforcement officer, disorderly conduct, and public drunkenness. (Def.'s SMF ¶¶ 26-7; Pl.'s Resp. ¶¶ 26-7.) After Deputy Jackson placed him under arrest, Plaintiff received medical treatment at the Georgia Dome before being transported by ambulance to Grady Memorial Hospital ("Grady"). (Def.'s SMF ¶¶ 27-8; Pl.'s Resp. ¶¶ 27-8.)

At Grady, doctors took x-rays of Plaintiff's neck and assessed his

condition. (Sapon Dep. 45:16-23 ). The x-ray did not reveal any evidence of a fracture. (Sapon Dep. 70:19-25.) After Grady released Plaintiff, Deputy Jackson escorted him to the Fulton County Jail, where he was held a few hours prior to his release. (Def.'s SMF ¶¶ 33-34; Pl.'s Resp. ¶¶ 33-34.) Plaintiff returned to West Virginia the day after the game. (Sapon Dep. 52:20-53:13.)

Upon returning to West Virginia, Plaintiff saw a neurologist and had a CAT scan performed. (Sapon Dep. 53:14-23.) Plaintiff, however, did not undergo any further medical treatment for his neck. (Id.) Although his neck was sore for a couple of days after the incident, he was able to return to classes. (Sapon Dep. 57:15-23.) Plaintiff contends that he occasionally has "soreness" in his neck, as well as headaches. (Sapon Dep. 59:1-15; 63:17-21.)

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) defines the standard for summary judgment: courts should grant summary judgment when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." The substantive law applicable to the case determines which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). "The district court should 'resolve all reasonable doubts about the facts in favor of the non-movant,' . . . and draw 'all

justifiable inferences . . . in his favor . . . .'" Four Parcels, 941 F.2d at 1437. The court may not weigh conflicting evidence nor make credibility determinations. Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993), reh'g denied, 16 F.3d 1233 (1994) (en banc).

As a general rule, "[the] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). Rule 56(c), however, mandates that the a court enter summary judgment against a party who fails to establish the existence of an essential element of her case when the party bears the burden of proof at trial. Konikov v. Orange County, Fla., 410 F.3d 1317, 1321 (11th Cir. 2004).

### III.   Analysis

The United States Code provides a right of action against an individual, who acting under the color of state law, deprives anyone of "any rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. "Section 1983 alone creates no substantive rights; rather, it provides a remedy for deprivations of rights established elsewhere in the

Constitution or federal laws." Russell v. Fannin County Sch. Dist., 784 F. Supp 1576, 1580 (N.D. Ga. 1992) (O'Kelley, C.J.).  Plaintiff relies on Section 1983 to assert a claim that Deputy Jackson violated his rights under the Fourth Amendment by using excessive force in effectuating his arrest.

### A.     Excessive Force and Qualified Immunity

Qualified immunity is an affirmative defense available to a government official sued personally.  Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004).  The rule's purpose is to allow the official to carry out discretionary duties without undue fear of personal liability or harassing litigation, provided they do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982); Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002).

A police officer such as Deputy Jackson, is entitled to qualified immunity if his actions were objectively reasonable, "that is, if an objectively reasonable officer in the same situation could have believed that the force used was not excessive."  Herrington, 381 F.3d at 1247.  For qualified immunity to apply, Deputy Jackson must first show that he acted within the scope of his employment when the incident occurred.  Vinyard, 311 F.3d at 1346; Herrington, 381 F.3d at 1248.  Here, both parties acknowledge that

Deputy Jackson was acting within the scope of his discretionary authority. Thus, the burden shifts to Plaintiff to show that Deputy Jackson violated his constitutional rights. Id.

To make this determination, the Courts must first determine whether Plaintiff's allegations, if true, establish a violation of a constitutional right. Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 2514 (2002); Herrington, 381 F.3d at 1248. If a constitutional right would be violated based on Plaintiff's version of the facts, then the Court must determine whether the right was "clearly established" under the law existing at the time of the alleged violation. Vinyard, 311 F.3d at 1346; Herrington, 381 F.3d at 1248. "[T]he burden is on the plaintiff to show that, when the defendant acted, the law established the contours of a right so clearly that a reasonable official would have understood his acts were unlawful." Post v. City of Ft. Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993).

  B. **The Fourth Amendment Excess Force Claim**

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The Fourth Amendment applies to state and local government officials like Deputy Jackson through the Due Process Clause of the Fourteenth

Amendment.  See Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684 (1961).  A claim that a law enforcement official used excessive force in the course of an arrest, investigatory stop, or other "seizure" of his person is governed by the Fourth Amendment.  Graham v. Connor, 490 U.S. 386, 388, 109 S. Ct. 1865, 1867 (1989); Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005).

In analyzing an excessive force claim, the Court must determine whether the force used was reasonable under the particular facts and circumstances of each case.  Graham, 490 U.S. at 396, 109 S. Ct. at 1871.  "To determine whether the force used is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake."  Jackson v. Sauls, 206 F.3d 1156, 1169-70 (11th Cir. 2000).   The reasonableness inquiry is an objective one.  Herrington, 381 F.3d at 1248; Sauls, 206 F.3d at 1170.  "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Graham, 490 U.S. at 397, 109 S. Ct. at 1872.

Courts consider a number of factors to evaluate whether an officer's use of force is objectively reasonable, including:  (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of the officer or

others; and (3) whether the suspect is actively resisting or attempting to evade arrest. Id. at 396, 109 S. Ct. at 1872. Additional factors the Court may consider are: (1) the need for the application of force; (2) the relationship between the need for force and the amount of force used; and (3) the extent of the injury inflicted by the use of force. Sauls, 206 F.3d at 1170 n.18.

  For example, in Hernandez v. City of Hoover, 212 F. App'x 774 (11th Cir. 2006), officers were attempting to gain control of several suspects after being called to the scene of a fight. The officers arrested and handcuffed plaintiff. Id. at 774. After plaintiff, who was stumbling around and smelled of alcohol, twice failed to comply with the officer's instruction to sit down, the officer kicked him in the back of the calf, fracturing his ankle and tearing a ligament. Id. at 775. The Eleventh Circuit held that the officer did not use excessive force in kicking plaintiff, and was entitled to qualified immunity. Id.

  Similarly, in Zivojinovich v. Barner, 525 F.3d 1059 (11th Cir. 2008), several officers were escorting plaintiff out of the Ritz Carlton in handcuffs. During an earlier altercation with the officers, plaintiff's nose had been broken and he sprayed blood when he spoke. Id. at 1073. One of the officers told plaintiff that he was spitting blood at him, and plaintiff responded that "You think I am spitting blood at you. You should have thought of that before

you broke my nose." Id. at 1065. After this comment, two other officers used their taser guns on plaintiff's shoulders. Id. The Eleventh Circuit held that the use of the taser guns on plaintiff while leading him out of the hotel in handcuffs was not an unreasonable use of force under the circumstances. Id. at 1073. See also Jones v. City of Dothan, 121 F.3d 1456, 1460 (11th Cir. 1997) (holding that officers entitled to qualified immunity where they slammed plaintiff, who had recently had a stroke, against wall, kicked his legs apart and placed his arms above his head, causing pain to his arms and arthritic knee); Benton v. Hopkins, 190 F. App'x 856 (11th Cir. 2006) (holding that officers entitled to qualified immunity where an officer applied baton strikes to plaintiff's legs and neck after another officer administered pepper spray directly in his eyes).

Like the situations in Hernandez and Zivojinovich, Deputy Jackson did not use excessive force in violation of the United States Constitution. Prior to entering the Georgia Dome to watch the game, Plaintiff drank five or six beers. Toward the end of the game, an individual identified Plaintiff to a security officer as the source of a disturbance. Plaintiff and his friends were then asked to leave the Georgia Dome, and Deputy Jackson proceeded to escort them out. As Plaintiff exited the stands, Deputy Jackson noticed that Plaintiff appeared intoxicated. While Deputy Jackson was in the process of

escorting Plaintiff, who is six-foot-one and 185 pounds, out of the Georgia Dome, Plaintiff abruptly turned halfway to his right. Deputy Jackson then struck Plaintiff with a closed fist in the back of the neck, and Plaintiff fell to his knees.

Deputy Jackson struck Plaintiff in response to his sudden movement. It is not unreasonable for an officer following an individual who had been identified as causing a disturbance at a college football game, and who had been drinking and smelled strongly of alcohol, to believe that the use of force was necessary in response to the individual suddenly turning around as he is being escorted out of the game. Deputy Jackson delivered a single blow with his fist to Plaintiff's neck. He did not use his nightstick or a flashlight, and he did not use any additional force aside from this single blow. Plaintiff was not restrained at the time. Although Plaintiff was taken to Grady for x-rays, Plaintiff sustained only minor injuries from the incident. Like the force used by the officers in Hernandez and Zivojinovich, the force used by Deputy Jackson was reasonable under the circumstances.

The cases relied upon by Plaintiff in opposition to Defendant's motion for summary judgment are factually distinguishable from this case. For example, in Slicker v. Jackson, 215 F.3d 1225 (11th Cir. 2000), the officers kicked plaintiff, who was handcuffed and not resisting, in the ribs and

knocked him unconscious by repeatedly hitting his head on the pavement. Slicker, 215 F.3d at 1233. Similarly, in Smith v. Mattox, 127 F.3d 1416 (11th Cir. 1997), an officer intentionally broke an individual's arm in multiple places after he had restrained the individual. Smith, 127 F.3d at 1419-20. Here, Plaintiff was not restrained and Deputy Jackson delivered a single blow, which inflicted minor injuries. Unlike Slicker and Smith, Deputy Jackson's use of force was not excessive under the facts of this case. Accordingly, Plaintiff has not satisfied his burden of showing that Deputy Jackson's conduct violated the Fourth Amendment, and, thus, Deputy Jackson is entitled to qualified immunity. The Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's excessive force claim.[1]

### C. State Law Claims

It is unclear from the Complaint whether Plaintiff intended to bring claims under Georgia law in addition to his federal claims for excessive force.

---

[1] To the extent that Plaintiff sues Deputy Jackson in his official capacity as a Deputy Sheriff of the Fulton County Sheriff's Department, he is entitled official immunity under the Eleventh Amendment for such claims. See Mladek v. Day, 293 F. Supp 2d 1297, 1304 (M.D. Ga. 2003) (Sheriff and deputy sued for excessive force during and after arrest entitled to official immunity under Eleventh Amendment for claims brought against them in their official capacity); Morgan v. Fulton County Sheriff's Dept., 1:05cv1576, 2007 WL 1810217, at *5 (N.D. Ga. Jun. 21, 2007) (Forrester, J.) (Sheriff and his deputies entitled to Eleventh Amendment immunity as to excessive force claim); Cameron v. Holland, No. 2:05cv920, 2008 WL 819070, at *2-3 (M.D. Ala. Mar. 25, 2008.).

The Complaint, however, does not sufficiently set forth any state law claims. In addition, to the extent that Plaintiff intended to assert claims under Georgia law, Plaintiff has not offered any facts that Deputy Jackson acted with actual malice or that he deliberately intended to do a wrongful act. See Adams v. Hazelwood, 520 S.E.2d 896, 898 (Ga. 1999) (holding that for purposes of official immunity, actual malice means that the individual acted with the deliberate intention to do a wrongful act); Anderson v. Cobb, 573 S.E.2d 417, 419 (Ga. Ct. App. 2002). Finally, Plaintiff failed to address any state law claims in response to Defendant's motion for summary judgment. Therefore, the Court **GRANTS** Defendant's motion for summary judgement to the extent that Plaintiff asserts any state law claims arising out of the incident at the Georgia Dome.

## IV. Conclusion

For the reasons discussed, the Court **GRANTS** Defendant's motion for summary judgment [# 43]. The Clerk is **DIRECTED** to **CLOSE** the case.

**SO ORDERED**, this __17th__ day of June, 2009.

_____
JACK T. CAMP
UNITED STATES DISTRICT JUDGE